The next matter, number 23-1853, Seafreeze Shoreside, Incorporated, et al. v. United States Department of the Interior, et al. At this time, counsel for the appellant will introduce himself on the record to begin. Good morning. Theodore Hadjiantich for Appellant's Commercial Fishermen. May it please this court, I ask for two minutes of rebuttal. Okay, the two minutes are granted. And before we begin, let me just make some general comments. First of all, we have received several Rule 26J letters. We're familiar with the contents of those. It's important for the purpose of the arguments that, again, we have a record and that we focus on the record. I believe there's two issues I think at some point during your arguments you should, both parties, raise. Some months ago, we decided the Nantucket residents against turbines case. So I guess from your position, you might want to tell us why it's not applicable or distinguishable, or the other party, why it's applicable or applies. And then there is also the issue of the Blum Supreme Court ruling, and I will say, at least I'm speaking for myself, but it would appear to me, and I'll hear from you if I'm wrong or you think I'm wrong, that this is not a case where we're not deferring to agency interpretations of a regulation. This is an agency that's granting permits, and it's involved in the permit-making process. So it would appear that it's a different scenario, but I just, rather than taking a minute away from your time by saying this, I'll go up ahead. So having said that, and again, my questions go to both parties, and please proceed. Thank you, Your Honor. This case is about the safety and environmental harms caused by the Vineyard Wind Project. I'm going to focus my remarks today on the interpretation and the statutory issues under the Outer Continental Shelf Lands Act, and separately, the standing issues in connection with all of the environmental claims. Regarding the Outer Continental Shelf Lands Act, or OCSLA, the district court erred by misreading OCSLA Section 1337-P4. This court has not yet interpreted that OCSLA provision. Now, the title of Section 1337-P4 is the term requirements, and that's relevant, although not the exclusive basis for judging the textual context. The text itself states that the Secretary shall ensure that renewable energy projects on the Outer Continental Shelf provide for a variety of requirements, including, most importantly for our purposes today, safety and the protection of the environment. The word shall typically is construed as a mandatory duty. Secretary's duties to ensure safety and protection of the environment do not include a reasonableness test or a balancing test. Of course, courts cannot add words to a statute that aren't there. The district court read the word ensure to mean that the Secretary has discretion to balance the duty to protect safety against the duty to protect the environment. That reading dilutes the statute's terms and weakens its language. In doing so, the district court erred by essentially deferring to the federal defendant's interpretation. That's set forth at addendum pages 9 to 10 and 44, and at the appendix pages 1276 to 1277. So I understand everything you just said. I understand ensure. I understand that's a mandatory word. But it seems to me that the other language is it's an activity in a manner that provides for safety. Now, if that means maximum safety, it strikes me that the answer would always be we'll do nothing. It's safer always to just leave the ocean untouched than it is to put a big wind turbine in it, right? It will always be safer to not do it. But that can't be the answer, right? It's not, and we're not asking for this court to take an absolutist approach. So what does the word ensure actually mean? I think it's important to look at the context. It means to make sure or to make certain that the project actually provides for safety on the one hand and protection of the environment on the other hand. And if you have to put percentages, what it has to be, because there's no specific percentage. Does it have to be, you know, environment, 95 percent, safety, five percent? You know, what comes, you know, what's the magic formula? I don't think there is a magic formula. It's a determination made on a case-by-case basis. Now, again, we're not asking for absolute perfection, but the statutory standard does set a high bar, and it's a very high bar. So if you're in the federal government and you... But do you disagree? There was analysis in the record of decision of how this would affect safety, and mitigating measures were made to include safety. They changed the direction of the project. They limited the number of turbines. They did things to respond to safety. So if I take a hypothetical that's different than something as complicated as this, we're going to design a car, and the government's going to decide whether that car was designed in a manner that provides for safety. That can't mean we're all driving armored tanks, right? So there are things that the government analyzes about safety and says, this, in our view, meets a safe car. Now, not driving or driving armored tanks would be safer, but that doesn't seem like that's what it means. And there was analysis of safety in this case. You may not agree with where they came out, but there was analysis. Your Honor, there was consideration of safety. Certainly there was. But if you take a look at the final environmental impact statement, what it says is construction and operations will pollute the waters, will harm, displace, and kill marine life, will increase collision risk, and interfere with navigational radar, and create serious safety hazards. But the agency did take that into consideration. It's not like one thing would be like, oh, let's shelf that, and we're not going to even consider that. Let's, you know, they're considering everything. And then they're making a determination. They took it into consideration. But consideration of safety and consideration of protection of the environment does not meet the statutory standard. But you agree that they took steps, right? They took steps in regard to concerns for safety, right? They did limit the number of turbines, correct? They spread them out further, correct? I will agree that they considered safety issues. And made decisions to improve safety, like spread out the turbines. That's the reason for that, isn't it? I think it's arguable that the current spread of the turbines does not ensure safety, does not permit the appellant. It ensures that the activity provides for safety. It says, the statute doesn't say ensure safety. It says ensure the activity provides, it's done in a manner that provides for safety. And they got a project that they said is not safe enough because these things are too close together. And they're in the wrong direction. We're going to change the direction. We're going to spread them out further because we want there to be more safety. And now we think, the Department of Interior, that that is sufficient safety, that this project is done in a manner that provides for safety. Why am I wrong in thinking of it that way? In fact, it does not provide for safety. And it's not based only on the numerous declarations in this case. It's based on the record of decision itself. This is very important. Record of decision states at appendix 1239, quote, due to the placement of the turbines, it is likely that the entire Vineyard One area will be abandoned by commercial fisheries due to difficulties with navigation. Now, we know that the district court determined that not to be, that that was the party's position, not the agency's finding, right? Well, I know you disagree with that, but that is what the district court concluded. Your Honor, just a few weeks after commercial fishermen filed their complaint, pointing out that specific section, the federal defendants tried to rescue the record after having read the complaint with the so-called supplement, attributing the statement to comments made during the comment period. Right, but just answer my question. The district court, you made that argument, right? The district court said, I hear you, but I determined that that's a clerical error. I'm accepting that that supplemental was appropriate to correct the clerical error. And for us to displace that now, we would have to say she abused her discretion, wouldn't we? Yes, we're asking this court to revert that because this court should take the edit for what it is, given the timing. What's the evidence that that was a manipulation as opposed to what the district court found that it was? It's a transparent effort on the part of the federal defendants to substantively change the record of decision. Well, that's just a conclusion. What's the evidence that that's what they did? I think the timing speaks for itself on that issue. And as a matter of fact, Your Honor, the edit contradicts the pre-existing administrative record, which details the safety, environmental harms, and the project is going to cause and supports the original language in the rod. The other things that support the original language are the declarations. There are a dozen declarations, I'm sorry, more than half a dozen declarations that support the original language in the rod. Okay, so let me just follow through your argument. We would need to find, one, the district court abuses discretion, including that that was a clerical error. I understand that argument. And then we would have to say, therefore, what the Department of Interior decided was this will destroy commercial fishing, and that's so at odds with one of the OSCLA requirements that it was wrong to issue the COP under OSCLA. That's what the rod said, that it will create an abandonment of that fishery. And that would be, and so your position is, unlike the safety one where we had this back and forth about what's enough safety, your position is that's such a clear destroying of commercial fishing, abandoning of the area, that that is just absolutely at odds with one of the 12 requirements, and therefore the department had to reject the COP. It's more than that, Your Honor. It's at odds with requirement A for providing for safety and requirement B for providing for protection of the environment. It's not just the safety issues. I mean, if you take a look at the appendix. Now, this is a 290,000 page record, and it's been a challenge for everybody involved here. We are aware. To really get their arms around this. But if you take a look at appendix 1196 to 98, 1205 to 1206, 1208 to 1210 and 1219, you'll see the serious, I think it's appropriate to call them admissions by the federal defendant on all of the safety and environmental risks inherent in approving the project. And given the structure of 1337 P4, to ensure that the action provides for A, safety, B, protection of the environment, there's no balancing requirement there. There's not even a consideration. Now, it is true that subsection... But I don't know if it's balancing as opposed to they required mitigation to the point in which they determined that whatever the word safety means has been met. Or whatever the word environmental protection means has been met. I know they talk about balancing, but I guess that's not how I'm thinking about it. They reviewed the project. They said there are issues with safety that you point out. There are issues with the environment, which you point out. And we are going to require certain things happen to modify this project such that now we, the Department of Interior, think those things have been satisfied. What's wrong with that? As I said, 1337 P4 sets a very high bar. And that high bar is if you haven't provided for safety, and if you haven't provided for protection of the environment, no matter if you've mitigated to some degree, but if you haven't provided safety and you haven't provided... And where does the definition of safety come from? Where does one define, this is, at this magic moment, this goes to Judge Helpe's question, safety has been met. We've now met safety. I mean, you and I could disagree about what a safe car is, couldn't we? I mean, I think it requires X, you think it doesn't. I mean, we both think the cars are safe. It's fact specific. And under these facts, given the citations to the record that I've provided, and of course, there are many more citations in the briefing. Under these facts, they've neither provided for safety nor the protection of the environment. They can't balance one against the other. Let me, you keep mentioning the word balance, but isn't the test really, you know, consider safety and the environment? Because there's nothing that's saying you have to balance it. You consider both. And when you consider both, you have to consider it like the big picture, the full panoply of both. Your Honor, the test is not considered. There's one subsection of 1337 P4 where the test is considered. And that's P4J Romanet III. And there, the test is simply consideration of other uses of the Cs. That word consideration doesn't appear in A or B, for safety or the environment. There's also a reasonableness test, and that's in subsection J, which says reasonable uses of the Cs. But reasonableness doesn't modify safety or the environment. Again, it's a very high bar that Congress set. I didn't set that bar. Congress set that bar. And where one section of the statute includes a term, but another does not include the term, the assumption is that Congress did so intentionally. Let's move off the OSCA claims. I have a quick question about the NEPA, the zone of interest test. How does the record here, or what is it in the record here that connects the alleged impact to the ecosystem to your members? I'm sorry, Your Honor, I didn't understand. Okay. In terms of the NEPA claims, the district court did a zone of interest test there, right? And I think one of your arguments is the district court mislabeled that. I don't want to discuss that. What I'm wondering is what is your argument that what in the record connects the alleged impact here to the ecosystem, to the waters, to the fisheries, to your organization, your members? Well, two things, Your Honor. Number one is that the appellants here, the commercial fishermen, use the Vineyard Wind Project area for a bulk of their yearly income in terms of the catch that they get from that area. So that's number one. Number two, this case is almost exactly point for point, like the Supreme Court's case in Monsanto Company v. Gerson. Commercial fishermen in Monsanto, they claimed that an environmental harm, specifically genetic mutation, caused them economic injury by devastating their crops. Okay, let me ask the question just again, and let me see if I can get to the nub of this. So the judge says NEPA doesn't protect economic injuries. I'm not sure that's right. What I understand, though, to be that NEPA can protect economic injuries if those injuries are environmental. And I see a dispute in the case where one side tells us the injuries are navigational, safety, those are not environmental. And then your side, an alliance, you tell us, no, they're environmental. Now, the district judge said the affidavits submitted by your side that tried to lay out the environmental claims were insufficient because your clients didn't have personal knowledge to make these claims about the environment. So I want to know, what is the evidence that says that the loss of money that your clients, I think there's at least a disputed fact, will suffer is caused by environmental harm versus safety slash navigational? The loss of the evidence is twofold. Number one, many of the citations that I provided just a moment ago are citations to specific environmental harms on displacement and killing organisms in the Vineyard Wind Area that actually are part of the catch for the appellants. There are declarations, more than a half a dozen, which say the same thing. These declarations, Your Honor, are from... But to what specifically are they saying? Where in the record? The declarations? Specific to your client's fishing interest, the species, the health of the ocean. What happens to the fish that hurts them? Where do we find that? They're throughout the final environmental impact statement, but I don't know if you want me to repeat the citations I've already given. Are they in your brief? They are in the brief, and they're also in the citations. But more importantly, the district court discounted the testimony of, for example, David Arapach. He's the owner and president of Appellant Old Squaw Fisheries. David's been fishing in the Vineyard Wind Area for over 40 years. He knows that area. He knows what attracts fish and what doesn't attract fish, otherwise he wouldn't have been a successful commercial fisherman. He knows what environmental elements are good and bad for those fish. And in his declarations, he goes through, if you will, chapter and verse, line by line, exactly the basis of his knowledge and what those impacts are going to be on the fish. Unfortunately, the district court totally discounted those because essentially he doesn't have a master's or PhD in oceanography. That's one thing. But if I may go back... Let me ask, did you try to get his statement or testimony in as an expert? You don't have to have necessarily the PhD, but you have to develop under Dobert like an expertise. Was that attempted below or was it simply offered as a declaration and not as an expert? It was offered as a declaration who has very keen, extensive knowledge of... Was it offered as an expert declaration? Because you don't have to be a rocket PhD scientist. You can have just practical knowledge without ever even a high school degree and you can have a lot of knowledge. But it has to be accepted by the court as an expert. So this did not go through the rules of 701 to 704 for establishing expert testimony, correct? It did not, Your Honor. However, there was a preliminary injunction motion which the district court denied. And there's a hearing in connection with that motion. And at that motion, David Arapache, again, the owner of Appellant Old Squaw Fisheries, gave detailed testimony. Is he a member of Seapreach Shoreside or of Alliance? He is a member of the Long Island Commercial Fishing Association, or LCCFA. And he's a member in his personal capacity. So consequently, I don't know if this is where you're heading, but consequently, LCCFA can stand in Mr. Arapache's shoes to basically make his claims under NEPA and the ESA because he testified that not only is this area a prime fishing area supporting his bottom line, but it's also an area that gives him personal aesthetic and spiritual pleasure from going out and looking at, among other sea creatures, the North Atlantic right whale. And that's your standing basis for the Mammal Protection Act, correct? That. For the ESA, exactly. Well, not the ESA, the Mammal Protection Act. What brings LCCFA in the zone of interest is that Mr. Arapache likes to watch the whales, has an aesthetic interest in the whales. And you tell me LCCFA represents Mr. Arapache and part of his purpose is the beauty of the ocean, something like that. So, Your Honor, we, the commercial fishermen in this case, did not brief the Marine Mammal Protection Act. That was only Alliance. OK, so you only have ESA. Now, so, OK. ESA and NEPA together. OK, yeah. And the LCCFA issue for ESA becomes the judge concluded you presented the evidence of its purpose too late. And you asked her to take judicial notice after summary judgment briefing had closed. Now, to not follow that, we would, again, we'd have to find that's an abuse of discretion, wouldn't we? I mean, you did miss the deadline, correct? So, only with regard to the Articles of Incorporation. But we don't need the Articles of Incorporation to sustain. Just back up for a second. Could you answer Judge Afram's question about the standard we have to review that argument? It's an abuse of discretion, isn't it?  Thank you. So, we don't need the Articles of Incorporation to support LCCFA's standing to represent David Arapache's personal interests. Because they come out in Mr. Arapache's declaration and in the declaration of Bonnie Brady, who's the executive director of LCCFA, who basically describes what LCCFA's purposes are, how they're germane to Mr. Arapache's personal interests, personal aesthetic and spiritual interests, given his life calling as a commercial fisherman. So, we don't need those Articles of Incorporation to sustain standing under the ESA, or for that matter, NEPA. And of course, with regard to NEPA itself, appellant commercial, appellant old squaw fisheries has standing under Monsanto. Because it's exactly when crops are harmed as a result of genetic mutation, that's not fundamentally different from trying to protect fisheries. That may be true for NEPA, but I distinguish that from the ESA. Those are different zones of, they are different statutes. They are. I just wanted to kind of close the ribbon on that one. Okay. Thank you. You're going to have some rebuttal time. Thank you. Let's hear then from Counsel Hanson Young. And please identify yourself for the record. Before you start, I'm going to ask you a question, so I don't cut from your time. Good morning, Your Honors. May it please the Court. My name is Tecla Hanson Young, and I represent the United States. Okay. Thank you. You were here some months ago, and this is the same question I asked you.  But let's assume the United States prevailed in this case. This does not mean that the United States Department of the Interior, the Bureau of Ocean Energy Management, is just simply going to say, well, when your turbines are in place, that's not a problem. You continue to review issues. If matters come up periodically, there's still agency review. There's other issues. And I know there have been, in your 26-day letters, some concerns. Those are concerns that, moving on forward, can always be looked at and considered, and changes can be made if appropriate, correct? This is not, you're not in a straight jacket. That is absolutely correct. We can see that those kinds of activities are occurring on the ground as we speak right now. Let me start the time, then. Okay. So it's literally the same answer you answered in the Nantucket resident case. It is the same answer. And probably in the next case, I'm going to ask you the same question, just for the record. Yes. Okay. So then proceed. Thank you. Thank you. Yes. And just to follow up on that, the Department of Interior, through the Bureau of Safety and Environmental Enforcement, maintains oversight over the operation of the facilities to ensure that they're being safely operated and that any new information that would be relevant to a change in its environmental analysis is taken into account. I wanted to address your earlier question about the effect of the Nantucket's residents and the Malone decisions on this court in the Seafreeze case. And I will address it later for the Alliance case when we get there. For the Malone case, I think that's very easy. These plaintiffs have raised no MMPA claims on appeal. They've raised those in district court. But this appeal wouldn't be affected by the Malone decision. For the Nantucket residents decision that was previously issued about the 2020 involving challenges to the 2021 biological opinion, again, that decision is only of limited relevance here to the extent that these plaintiffs have challenged the 2020 biological opinion. They haven't challenged the substance of the 2020 biological opinion, nor have they challenged the substance of the 2021 biological opinion. So this court would resolve their ESA claims on different grounds, namely a lack of standing, because when they filed the complaint, the biological opinion that they challenged, the 2020 opinion, was no longer in effect. So let's go through that. That's an area I'd like to talk about. So what I hear them saying, I'm going to make their argument, and then we'll go from there. What I understand, and I might mix Seafreeze and the Alliance, but big picture. This is what I understood. The 2020 biop came out. May 7th, the Department of Interior says, we need to do reinitiation, which is obviously encouraged and permitted under the regulations. So reinitiation starts. Fisheries says yes. May 10th, the record of decision is entered. The argument is that was illegal, because there was no biological opinion in force at the time that the record of decision was issued, because the reinitiation had the effect of vitiating the effectiveness of the 2020 biop. Do I, is that how you understood this argument? I think that's one of Seafreeze's arguments. I think their primary challenge was to the 2020 biological opinion. So I'm less interested, because I do think... But there's those two. So then they make arguments, there are problems with the 2020 biop. And I see your argument that, well, those are moot, because the 2021 eventually happens, and that's the one, and they don't complain about that. And this other case already said that one was fine. But this argument is different to say, the project never should have happened, because there was no 2020 biop. Yes, that's their argument. They have some Ninth Circuit cases where there is some language that says, when reinitiation happens, something like the project can't proceed. I'm just sort of paraphrasing that. And I think you have an Eleventh Circuit case that I think is the opposite of that. Help me with that. Sure. Let me walk you through it, and why the federal government complied with the ESA in this case. The... And I would just first like to note that Ninth Circuit decision didn't actually address the question here of what happens to a biological opinion when the agencies decide to reinitiate consultation. That language comes from the background discussion of what the statute requires. The Eleventh Circuit decision squarely addressed the question. And here, what we have is we have a situation where the agencies issued the biological assessments, decided shortly before issuing the record of decision that they needed to reinitiate consultation for two reasons. One was to look at the potential impacts of new monitoring surveys that BOEM wanted to include as a part of plan approval. And secondly, to address new population information about right whales. BOEM made an initial determination in its new biological assessment that the information it was considering would not affect any of its prior conclusions that the project would not result in jeopardy to any listed species. And so, and importantly, the agency in issuing the record of decision and issuing the subsequent approval of the plan of operations noted that it wouldn't authorize any monitoring surveys until the reinitiated consultation was complete. And that's important because the thing that needed more consultation were taking a proactive step to make sure that no harm happens while we figure it out? Right. And those were the surveys. And the other thing that the plan approval stated was that if there were any new terms and conditions or requirements that came as a result of the new consultation under the ESA, then they would have to be incorporated into the plan. So, prospectively said, if there's anything new that comes out of this, you have to do it. And in fact, nothing new did come out. And nothing new came out of it. And the plaintiffs haven't challenged the sufficiency of the 2021 biological opinion. And this court has also found it to be valid for the same reasons that were raised in the district court. So it's a very formalistic sort of, in the government's view, it's sort of a very formalistic argument with no real harm. But let me, so let me get to, this never gets reached by the district court, right? Because there's a standing issues standing in our way. Right. Which, so let me just make sure I understand. Let me just make sure I understand this. Well, we haven't pressed the standing. We've made a different standing argument on the ESA. So tell me what yours is. Our standing argument is that there was no redressability because at the point when they filed the complaint in December 2021, the new 2021 biological opinion had already been issued. So let me then, all right, now I understand that. Let me make sure I understand what you're not pressing, just to make sure I have this clear in my mind. What they say is there is no zone under Bennett, and there's a First Circuit case that says the same thing. Under the ESA, zone of interest and Article III injury are the same. That's right. And I think they know when may have pressed that, but the federal government has not pressed that. Okay, and what Alliance, so what Alliance says is, right, so our injury is, since there's a citizen supervision, we don't have to prove we particularly care about the whales. What we have to prove is this project hurt us. Under the citizen supervision. This project hurt us. We will lose money if this project goes forward. And the project shouldn't have gone forward because you didn't have an appropriate biological opinion in place when you issued the ROD. That's what I think Alliance says. In the other case. Right. And I know I'm mixing them up. No, no, it's fine. I think that's right, although we haven't, again, we haven't pressed, we haven't challenged Alliance's standing in that respect in the other case. In the other case. Now, Seafreeze tells me they're interested in the whales and David Arapak's interested in the whales and that brings them within ESA, which doesn't... I think that Seafreeze is saying that brings them within the realm of NEPA, which we disagree. But the only reason you say there's no ESA standing is because of the 2021 biological opinion, right? Right. But am I wrong to think that the way I at least, and again, I'm confusing them, but the way I presented Alliance's argument, they would have standing because they're saying the project never should have happened. That's our injury. And that's their... I think that's correct. Yes. So I, if I may, I would like to briefly address the OXLA argument. Just, I just have two quick points or maybe three, and then I want to address the NEPA issues that came up. The first quick point I want to make on OXLA is that, setting aside any sort of issues of statutory interpretation, I mean, this really isn't a statutory interpretation case. What the agency did here was look at whether the project would, whether the activity it permitted would be carried out in a manner that provides for the 12 goals. And it documented how it determined that the activity would be carried out in a manner that provided for those 12 goals or requirements. And do we then judge if I accept that? And that's a factual and a scientific determination. So when we get to like, is the safety that happened, quote, enough safety, unquote, is that an arbitrary and capricious review by us of what the agency did? That is still entitled to deference because it involves factual and scientific determinations made by the agency. When you talk about factual and scientific determinations, opposing counsel mentioned that there was a declaration that was presented and I questioned him, well, was that a rule, you know, rules of evidence, 701, 704, dobert, expert, and he said, no. Do you have anything to say about that? How should we consider that? Or I know the agency did not take that testimony. It considered it, but it did not give it weight. Anything you would like to say about that? Sure. So that's on the NEPA question and whether the plaintiffs can assert any interests that fall within the zone of interest of NEPA. Is NEPA sufficient to be able to bring their NEPA challenges? And the government's position is no. And our position is limited. It's not that commercial fishermen, or maybe even these plaintiffs, could never bring a NEPA claim. It's that the declarations that they submitted to the court are not sufficient. So the ROD says, and one brief points this out to me, that the fill, the dredge, will smother the larvae of the fish. That strikes me, I'm not saying that invalidates the project, but that does strike me as an environmental harm. I want to catch those fish. Those fish aren't going to be born because the dredge is going to kill them before they are born. There are less fish for me to find. That's an environmental harm. That brings me within the zone of interest of NEPA. Why is that wrong? I think it would be an environmental harm if we had plaintiffs who actually cared about environmental interests. Here, what we have is we have the fishermen saying, we want to be able to kill the fish ourselves. It's a commercial interest. It's a commercial interest, right? They're not saying, well, I mean, But they're not killing the fish. I mean, we're not against fishing, right? No, but it's not an environmental interest. That doesn't strike me as right. I mean, they care about the health of this environment that they want to use for reasons we all need, and the environment will be diminished such that they can't do that thing, that activity, because of the dredge is going to kill the fish. Sure, there's a money component, but the loss of money, to me, seems directly related to the environmental harm. I didn't see cases that say that's outside of NEPA. Well, there are several cases, actually, that we discussed, not in this briefing, but in the alliance briefing, where the various courts have held that interests in extracting natural resources are not environmental. They're commercial interests, because they're interested solely in the economic value of the resource that they're extracting. And I think it's particularly relevant here, where you have fishing interests who are, the declarations are concerned and identify the injury of being unable to access the fish. That's different. So that's navigation, and I'm separating that out. So if their only argument was navigation, I follow you. NEPA's not interested in navigation, but NEPA is interested in dredge that's going to kill fish, isn't it? Right, but the declarations with respect to harm to the marine environment are what the district court found and what we agree with, found are too speculative with respect to these plaintiffs. Would you agree that they don't have to be expert declarations? It could be a layperson who fished there, but they have to be more detailed? Yes. And why does that come from the declarations? The ROD talks about the negative effect that the dredge will have on these fish larvae. I read that in the record. Right. So why can't they rely on that? Just if I could briefly mention something about that. That's only during construction once. So it's not, and the record of decision and the environmental analysis did not expect the project to affect stocks at all. So these questions don't go to whether you win or don't win, but they do go to whether they can bring the claim. Right. That's kind of a low, sort of seems to me that's a lower, sort of. Right. But the plaintiffs, I think, so our position is that it's not just enough to allege general environmental harms. They have to link their specific interests to the environmental harms. All right. So how long is it going to take to build this thing? This project? Two to three years. So for two to three years, it's going to be dredge that's going to. In localized areas around each, but there are also seasonal restrictions in place to minimize impacts. But do you think that that all, I hear you, that all goes to, at the end of the day, was the NEPA process appropriate? That's a totally different thing to think about. But just on standing, just to get in the door. I agree. It's a close question. And I don't think that our position is not that these plaintiffs could never bring a NEPA challenge. And I think that even if they had named the individual owners of the companies, for example, AirPods himself, we would be in a very different situation. The problem is here the plaintiffs are the corporate entities themselves with exclusively economic interests. And they haven't shown how those corporate interests have any interest in protecting the environment. Except that they want fish. Except that they want to extract the resources. That are hurt by the bill. Right. And primarily that they can no longer navigate through the area. That's their primary harm that they identify. And then they rely on AirPods and others declarations for these, almost throwaway statements about, you know, squid are going to flee the area. And that's just not enough here to be able to bring a NEPA claim when it's so far removed from the individual plaintiffs. I would also say if the court finds that they have, that they fall within the zone of interest, the court could alternately enter judgment for the United States on the merits that have been briefed. Okay. Thank you. Let me ask, do you have any further questions? Yes, I do. You may have already said this, but can we just circle back to OXLA? The district court said the plaintiffs here have no standing. I don't see you really challenging that. Do you agree that under OXLA they do? We didn't press that argument on the environmental claims under OXLA because we just, we, you know, they, there are other interests that they have that are protected by OXLA. And we didn't think we needed to be so fine grained about it. But do you agree they're standing? Yes. We think that they can bring their, their options. And that wouldn't be an Article III problem, that would be a zone of interest problem? Yes. Yes. And we briefed those claims as well. Okay. Thank you. Thank you. Let's hear then from Mr. Steenland. Please introduce yourself on the record to begin. Good morning, your honors. May it please the court. Peter Steenland for Vineyard Wind. And I've got a lot to cover, but first I'd just like to say welcome. Thank you. Judge Aframe, it's an honor for me to be here on your first day. Do I get a welcome back? And it's great to see you again, Judge Elfie. Yes. Okay, please proceed. The issues under OXLA reflect a misunderstanding by the plaintiffs as to how the statute works. And they also reflect a failure to really grapple with the issues. We were talking a little while ago about safety. What Seafree's never mentioned is that there are other vessels that are traveling through that area that will do so. That in the EIS comments, when the Department of the Interior required Vineyard Wind to shift the alignment of towers, other vessels said, this is great. We can live with that. That works fine. Furthermore, the Coast Guard did a safety study and concluded that it was safe. So if you're going to argue under OXLA that the secretary violated this one criterion, you really have to take on the Coast Guard and its expertise. But beyond that, beyond that, there's a lot of general waving of hands and concern about, oh, this is too terrible. There are all these problems. But what is missed is any reference to the 31-page memorandum by the secretary explaining how she applied these 12 factors. In fact, what they say in their reply brief is, it has no legal effect.  So I understand. But the word safety is in the statute. Yes, it is. So people, how do we decide what that word means? One side focuses on insure. Another side focuses on a manner that provides for, but we're just going to use safety. For safety. And somebody has to decide what safety means. And it could be us. It could be the agency. Who makes that decision? Because that's not a word that's self-defining. It is in a sense, but not in a quantum sense. Yes, indeed, Your Honor. Absolutely. And what the court does is under traditional APA review, you look at what the agency said. You recognize its expertise. You give it a measure of deference. And then you say, have our opponents raised anything that would cause this to be arbitrary and capricious? And I think they have not. That's what this court does every day in a variety of factors for federal agencies across the spectrum. But what we really need to know here and what is not addressed was, for example, in this 31-page memorandum, looking at the other OCSLA factors, the secretary talks about how this area has shrunk. How she picked it and made it smaller and then even smaller. And we detail all that in the briefs. At page 20 of this supplemental memorandum, Supplemental Appendix 21-23, she describes how the BOEM specifically selected this lease area to reduce potential use conflicts between the energy industry and fisheries. And then you go three pages later, and what you find is that of the approximately 225 vessels that NIMS counted in the area, less than 2% of their income comes from the project area. That, I think, is rather telling. And I think that when you look at how this court has interpreted a similar provision, not the identical one, but a similar, I mean, when we were back in the McCormick courthouse doing Massachusetts versus Andrews, the same arguments were made. That you can't touch the fisheries. They're violent. And Judge Campbell, writing for the court, said, no, that's not so. And he describes how that gets balanced. I think that's very good guidance for this court. I think it instructs the court, or at least assists the court, in how to read that. With regard to standing, and I know that's a difficult issue, but with regard to standing, I think that the government has it exactly right. No one's saying that commercial fishermen can never sue. We're saying these plaintiffs cannot sue because they're corporations. So what's wrong with what I said five minutes ago, which is the corporation has an interest in the healthy fish because that is their bread and butter, so to speak. And those fish, arguably, there's some evidence in the record that they will be hurt to some degree so that the fish will not be as healthy after the project as before. I, corporation, not person, am hurt by that. I can assert the environmental claim. Why is that wrong? There's two things wrong with that, Your Honor. First of all, it is an economic injury. I mean, you could make the same argument if you're a timber company for a healthy forest. In fact, if these folks have standing, so does Legal Seafood. So does McDonald's that protects filet of fish. I mean, at that point, they have the same focus. And they can- Why is it any better than if I want to take my children and go fish? You're going to tell me that there's fewer fish I have standing because that's- Because you have a recreational interest. Why is that better? I don't understand that. That's environmental. It's not commercial. By definition, it's going to be very difficult for a corporation to assert environmental claims. But let me make one other point, if I may. Which is that the claim about harm is ultimately an injury that at a summary judgment stage, they need to prove. And the injury that they're talking about, well, the one that you're using, has to do with a temporary transitory area where the vineyard wind has dredged to lay cables to each of these. It's a temporary impact. It's very limited in terms of connecting each facility to the others. And in two or three years- All true. All true, or at least I understand. But we're not at the merits, and we're not at this should have blocked the project, or that the need for evaluation of it was arbitrary and capricious, or not done. Like, I'm not suggesting any of that. But at the minimal level of, do you suffer some kind of injury? And it may be transitory. But it's two to three years, I was just told. And I will lose money because of a harm to the fish population over those two to three years. At a minimal, like, do I just get in the door to make my claim? You still say no. I say no, Your Honor. Absolutely. Judge Montecarlo, any questions? No, thank you. Okay, thank you very much. Thank you very much. Two minutes for rebuttal. Let's hear from Mr. Hadji Antic. Please reintroduce yourself on the record to begin. Theodore Hadji Antic, again, for the Pellants Commercial Fishermen. Just very quickly, the discussion by the federal government and Vineyard Wind ignored the recent Supreme Court decision of Loper Bright. Slip of opinion at 14 and 15, agency interpretations of statutes, like agency interpretations of the Constitution, are not entitled to deference. That was one of the questions I asked at the beginning. I think I misspoke. And I gave the wrong name for that decision. But isn't this, like, permit granting? We're not deferring to agency interpretation. We're reviewing whether, you know, the permit, administratively, it complies with our standard of review. The question is whether the district court deferred to the agency judgment. And the answer is yes. And again, the citation- Wouldn't that happen probably in every case we affirm an agency? Because it's an agency judgment, and we're affirming it. But it's deferred to the agency's judgment regarding the meaning of 1337 P4. That's a statutory interpretation issue that the Supreme Court and Loper Bright reserved strictly for courts, for the judicial branch. What if we affirm, and we make the interpretation ourselves, or the district court, and we say, or the district court says, I am considering that. That could be persuasive. But on my own independent analysis, this is the result we reach. And therefore, you know, the agency did the appropriate thing. That surpassed that. Well, as long as this court reaches an independent judgment, as opposed to deferring to the agency's interpretation, as the district court did. If we said the sort of preferentory clause that has ensure and man and provide for, that means, that doesn't mean maximum of all these 12 things. That's not what it means. Then what? The Supreme Court says to give the best interpretation. If that's this court's best interpretation, then you've met the requirements. And then under our interpretation, then we analyze the problem, the claim. Yes. Can I just nail that down? I want to make sure I get it. So if I think that that first paragraph doesn't require the maximum amount of all the 12 things, then is the question of whether there was enough of each of those 12 things reviewed under an arbitrary, capricious standard as we figure the case out. Have I done my job? As you understand, Loper Bright, if I interpret that first paragraph to say, it doesn't mean each thing has to be done to the maximum. That's not what Congress meant. It meant there's some play in the joints here. Is the then what arbitrary and capricious? I'm going to give that a qualified yes, Judge Afrin. And the reason is this. That if you apply the traditional rules of statutory construction to reach that conclusion, the answer is yes. But the argument is that applying the traditional rules of statutory construction, that conclusion cannot be reached because you don't give 90% weight to the term provide for and then give 5% to the weight ensure. It's ensure that the action, in this case, the approval of the project, provides for safety and provides for protection of the environment. Okay. Any 30-second closing thoughts or any other questions? Very quickly, Your Honor. Again, I just go back to Monsanto. Clearly, Appellant Old Squaw Fisheries has standing under NEPA and under NEPA for Monsanto and Mr. Aripach has standing under the ASA through LIPFA. And then finally, the automated information system that my counsel for Vineyard Wind indicated that the appellants don't fish much in the area. That is absolutely untrue because as the briefing shows, Mr. Aripach, for example, filed a declaration on this in detail, turns off his AIS because of two things. Number one, his boat is less than 65 feet in length. And therefore, AIS is not required under the regulations. And number two, the Vineyard Wind area is more than 12 nautical miles away from shore and AIS is not required there. So he turns it off. Why? Well, for a competitive advantage because he's such a good fisherman because he's been doing it for years. Thank you, Your Honor. Okay. Thank you, counsel. We're going to take a five-minute recess. I believe counsel.